```
                   UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF INDIANA
                         HAMMOND DIVISION


FESTUS M. McKINNIE,            )
                               )
          Plaintiff            )
                               )
     v.                        )  Case No. 2:05 cv 425
                               )
MICHAEL J. ASTRUE,[1]          )
Commissioner of Social Security)
                               )
          Defendant            )
```

OPINION AND ORDER

This matter is before the court on the Petition for Attorneys' Fees Under the Equal Access to Justice Act filed by the plaintiff, Festus M. McKinnie, on October 26, 2006 (DE 30), and the Motion to Amend His Petition for Attorneys' Fees Under the Equal Access to Justice Act filed by the plaintiff on November 9, 2006 (DE 33).  For the reasons set forth below, the plaintiff's petition for attorneys' fees is **GRANTED IN PART** and **DENIED IN PART,** and the motion to amend his petition is **GRANTED**.

Background

Festus McKinnie initially applied for Social Security Disability Benefits in November 1993 and was found to be disabled as of August 31, 1995. McKinnie appealed this conclusion, stating that his disability began on January 17, 1992. McKinnie testified in support of this before Administrative Law Judge William Wilkin on June 25, 1998.

---

[1] In accordance with Federal Rule of Civil Procedure 25(d)(1), Michael J. Astrue, who became Commissioner of Social Security on February 12, 2007, is automatically substituted as the defendant in this action.

Following the hearing, the ALJ's unfavorable decision was upheld by this court and appealed to the Seventh Circuit. On appeal, the court concluded that the "medical findings supported the ALJ's determination that McKinnie could perform sedentary work involving only occasional bending." **McKinnie v. Barnhart**, 368 F.3d 907, 910 (7th Cir. 2004). However, the Seventh Circuit also concluded that the vocational expert who testified at the hearing "did not substantiate her finding" and the "ALJ did not inquire into the reliability of her conclusions." **McKinnie**, 368 F.3d at 911 (*citing* **Donahue v. Barnhart**, 279 F.3d 411, 446 (7th Cir. 2002)). The court vacated the ALJ's step five determination and remanded "only for the purpose of determining whether McKinnie could perform a significant number of jobs in the regional economy between January 17, 1992 and August 31, 1995." **McKinnie**, 368 F.3d at 911.

Following the remand, a third hearing was conducted on August 8, 2005, before Administrative Law Judge Paul Armstrong. By written decision on September 15, 2005, the ALJ denied benefits for the period between January 17, 1992 and August 30, 1995. McKinnie sought judicial review of this decision and filed his complaint in this matter on November 18, 2005. He filed his opening brief on June 12, 2006.

On September 26, 2006, McKinnie and the Commissioner filed an agreed motion to reverse the ALJ's decision and remand McKinnie's case for further administrative proceedings before "a different administrative law judge who will ask a different

2

vocational expert to testify and will comply fully with *McKinnie v. Barnhart*." (*See* DE 27) On October 26, 2006, McKinnie filed this petition for attorneys' fees under the EAJA. The plaintiff seeks an award of fees under the provision of the EAJA that permits an award of market-rate fees based upon the bad faith conduct of the defendant.

## Discussion

The Equal Access to Justice Act provides that in an action against the United States, "the court shall award to a prevailing party . . . fees and other expenses . . . unless the court finds that the position of the United States was substantially justified." 28 U.S.C. §2412(d)(1)(A); *Conrad v. Barnhart*, 434 F.3d 987, 989 (7th Cir. 2006). A second means by which a party against the United States may seek fees and expenses is described by §2412(b). In pertinent part, this section states that the United States may be liable for fees and expenses "to the same extent that any other party would be liable under the common law."

Through its incorporation of the common law, this EAJA provision adopts "the 'American rule,' under which each party bears his own expenses of suit." *Stive v. United States of America*, 366 F.3d 520, 521 (7th Cir. 2004); *Gaffney v. Riverboat Services of Indiana, Inc.*, 451 F.3d 424, 466 (7th Cir. 2006). However, the Supreme Court has described three "narrowly defined circumstances" in which a prevailing party's fees may be paid by the opposing party. *Alyeska Pipeline Service Company v. Wilderness Society*, 421 U.S. 240, 259, 95 S.Ct. 1612, 1622, 44 L.Ed.2d

3

141 (1975). In addition to the common fund exception, which is not applicable in this matter, "a court may assess attorney's fees as a sanction for the willful disobedience of a court order." *Chambers v. Nasco, Inc.*, 501 U.S. 32, 45, 111 S.Ct. 2123, 2133, 115 L.Ed.2d 27 (1991); *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 718, 87 S.Ct. 1404, 1407, 18 L.Ed.2d 475 (1967) ("And in a civil contempt action occasioned by willful disobedience of a court order an award of attorney's fees may be authorized as part of the fine to be levied on the defendant.").

Under the third exception, "a court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Chambers*, 501 U.S. at 45-46, 111 S.Ct at 2133 (*citing* *Alyeska*, 421 U.S. at 258-259, 95 S.Ct. at 1622-1623). In *Stive*, the Seventh Circuit clarified this "canonical formula for the bad faith exception to the American rule," stating "when one looks carefully at Judge Zagel's definition of 'wantonly,' one sees that the key term is 'reckless disregard' and one is reminded that recklessness is frequently in the law a near synonym for intentionality." *Stive*, 366 F.3d at 522; *Gaffney*, 451 F.3d at 467. Further, the Supreme Court described the exception's purpose as a punitive measure, comparing it to a fine imposed for civil contempt. *Chambers*, 501 U.S. at 53-54, 111 S.Ct. at 2137 (describing sanction of fees as based upon "fraud perpetrated on the court and the bad faith displayed toward both his adversary and the court throughout the course of the litiga-

4

tion."). *See also* **Maritime Management Inc. v. United States of America**, 242 F.3d 1326, 1335 (11th Cir. 2001)(*quoting* **American Hospital v. Sullivan**, 938 F.2d 216, 220 (D.C. Cir. 1991)).

There is dispute among the circuits regarding the relevant stage of a claim when the court should assess the behavior of the party. It is clear, at least in the context of tort and contract claims, that the "pre-litigation" conduct that itself gave rise to the claim is not considered in the subjective assessment of the party's bad faith in its pursuit of the litigation. *See* **Sanchez v. Rowe**, 870 F.2d 291, 295 (5th Cir. 1989)("[B]ad faith . . . may not be based on a party's conduct forming the basis for that substantive claim."). However, in the administrative setting, the division between the litigation conduct and pre-litigation conduct has not been so easily drawn. *See* **Maritime Management Inc.**, 242 F.3d at 1336 ("[W]here administrative proceedings are intimately tied to the resolution of the judicial action, the administrative proceedings may sometimes be considered part of the civil case for which fees are awarded."). *See also* **Centex Corporation v. United States**, 71 Fed. Cl. 40, 50 (Fed. Cl. 2006).

This case does not require a determination whether the court's inherent power to sanction reaches a party's conduct solely at the administrative agency level or whether, in this instance, the administrative proceedings are "intimately tied" to the judicial proceedings. The court concludes that, even when fully considered, the ALJ's conduct did not rise to a level that

5

requires a finding that the Commissioner's conduct falls within the exceptions to the American rule.

McKinnie argues that "bad faith fees are also merited because . . . the ALJ refused to comply with the Seventh Circuit's order." (Plaintiff's Petition, p. 4) McKinnie's formulation appears to merge two distinct exceptions to the American rule - the exception based on conduct that is vexatious, wanton, or oppressive (bad faith), and the separate exception for the "willful disobedience" of a court order. This confusion continues in McKinnie's reply brief, when he states that this case "is more similar to a willful disobedience of a court's orders," but then he acknowledges that he has not requested "willful disobedience fees." (Plaintiff's Reply, p. 6) The court will address each exception.

McKinnie exclusively cites to the conduct of ALJ Armstrong during the course of McKinnie's hearing to illustrate the Commissioner's bad faith. McKinnie characterizes several comments by the ALJ as both unnecessary and badgering. For instance, on two occasions during McKinnie's hearing, the ALJ questioned McKinnie regarding his knowledge of the administration's Ticket to Work Act, stating "Well, let me tell you something. There's help that's available to you for free, especially if you're on disability." Later, the ALJ questioned McKinnie regarding his activity over the past 10 years, which McKinnie characterizes as "not innocuous" because this was time period relevant to McKinnie's appeal. The ALJ asked:

6

>    Q.   Well, do you want to change your life? You want to do something different? What have you been doing for the past 10 years?
>
>    A.   I would love to change my life. I hate my life.
>
>    Q.   I'm giving you a chance. Go over there - they give you a ticket. You'll get it free. Get all the stuff. You don't have to pay them $2,000. They'll do it for free. They'll get you educated, You'll - you're willing to do it, they'll give you nine months. If you go back to work they'll give you nine months of benefits. You can work and earn as much as you want and they'll still pay you out of your Social Security disability.

(Tr. 505-506)

Shortly after this exchange, the hearing again deviated from the subject of McKinnie's condition during the relevant period. In discussing McKinnie's belief that his past treatment had been inadequate, McKinnie stated:

>    A.   Yes, I hate that and I - at one time I felt like killing them people.
>
>    Q.   Well isn't it time you forget all that? I mean, they've been paying you.
>
>    A.   Can't forget that. Somebody take your life away, you ain't going to forget it.
>
>    Q.   But sir -
>
>    A.   You're not going to forget it, no matter -
>
>    Q.   - sir -
>
>    A.   - how many years go by. You're not -
>
>    Q.   - okay, now -
>
>    A.   - going to forget it.

7

> Q.  - now listen to me. Listen to me.
>
> A.  I mean, I had a good life.
>
> Q.  Okay. Now listen. There's a guy named Stephen Hawking. Have you ever heard of him? Seen him on T.V.? The author of the big bang theory? You know, in college he started developing Lou Gehrig's disease, ALS. It's inevitable [sic] fatal to everyone. Gradually, even before he wrote all these works, he developed problems with his musculature, so he couldn't even move. So he writes his books by nodding or moving his eyebrows at a computer, which picks out of a series of different phrases and words. And he's been able to work through horrible severe problems. And if you read his stuff on the internet, because I was looking into it, he say well, I don't even think about my problems . . . . I mean, it doesn't do any good to dwell on the past. Right? . . . You got some problems with your leg. Hell, there's a lot of people worse off than you, I see them all the time.
>
> A.  That's true. That's true.
>
> (Tr. 507-508)

At this point, the ALJ noted that McKinnie has "lost ten years" and urged him to "get your life together . . . . Your life isn't ruined. Stephen Hawking's life isn't ruined and look where he is. You know, you got to think positive. You're a nice looking fellow with some brains." (Tr. 508)

There is no question that conducting such exchanges is far beyond the ALJ's role in making a disability determination. *See* **Nelson v. Apfel**, 131 F.3d 1228, 1235 (7th Cir. 1997) ("The ALJ in a social security hearing has a basic obligation to develop a full and fair record."). In fact, there may be implications drawn

8

that suggest the ALJ did not believe McKinnie deserved disability benefits. However, the court cannot conclude that on the basis of such comments by the ALJ, the Commissioner's stance in this matter can be termed wanton, oppressive, or seen to constitute an abuse of the judicial process made with reckless disregard.

In addition, assuming that the administrative stages of this case are properly considered in assessing whether the Commissioner can be characterized as having acted with bad faith, the hearing before the ALJ is not isolated from the balance of the litigation in making the determination. Instead, looking at the entirety of the litigation, the court also considers the fact that the Commissioner stipulated to a reversal and rehearing of this matter, saving the time and resources of the parties, the court, and the agency. Despite the unorthodox speeches delivered by the ALJ, the Commissioner's conduct of this matter does not fit within this "exceedingly narrow exception" to the American rule. ***Federal Trade Commission v. H.G. Kuykendall, Sr.***, 466 F.3d 1149, 1152 (10th Cir. 2006).

McKinnie's second contention is that the ALJ disobeyed the Seventh Circuit's remand order. In that order, the appellate court determined that the vocational expert (VE) did not substantiate her findings and provided vague responses during McKinnie's cross-examination. The appellate court further noted that the ALJ did not inquire into the reliability of the VE's conclusion as he was required to do under ***Donahue***. In ***Donahue***, the Seventh Circuit concluded that if the basis for a "vocational expert's conclu-

9

sions is questioned at the hearing . . . then the alj [sic] should make an inquiry (similar though not necessarily identical to that of [Federal] Rule [of Evidence] 702) to find out whether the purported expert's conclusions are reliable." *Donahue*, 279 F.3d at 446.

Based upon the limited view provided by the bare transcript, it appears that, at most, the parties spent considerable time during the hearing disputing the extent of the inquiry the ALJ was required to make under *Donahue*. McKinnie's specific challenge to the VE's testimony regarded the process through which the VE, beginning with such sources as Employment Statistics Quarterly (incorporating U.S. Bureau of Census and Bureau of Labor statistics) and the Dictionary of Occupational Titles, then "extrapolates" final numbers for jobs using her own experience, as well as labor market surveys that the VE conducts (Tr. 518, 529). The VE stated that her conclusions generally were based on regular labor market surveys that she performs. McKinnie's counsel requested copies of the surveys that served as a basis to the VE's responses to the specific hypotheticals regarding McKinnie. The ALJ replied that, because these surveys were relied on only generally, the only means to accommodate this request is to provide all of the VE's labor market studies. The VE suggested that this effort would require as much as 50 hours. The ALJ and McKinnie's counsel were not able to resolve their difference regarding the labor market studies. During the course of this dispute, the ALJ stated:

10

> The initial - no, no - let's clarify it, Counsel. The initial figures are based on government quarterly information which are issued by the government and which we're - we are required to file. They reference DOT numbers. The extrapolation from those figures is based on [the VE's] experience, which is gained in a number of different ways. Part of it is private placement of individual clients. Part of it is through labor market surveys.

(Tr. 543)

McKinnie further points to the ALJ's statement that "If the Seventh Circuit wants to reverse every case I get, then they'll have to." (Tr. 552) In context, this comment is part of the on-going dispute between the ALJ and McKinnie's counsel regarding the application of *Donahue* to the labor market studies:

> Okay. I just went through why these people don't do any research prior to testifying. They base it on research that they've done in the past. This is not a case which involves extensive preparation, as in a [*Daubert*] case, where you might have a claimant who is permanently disabled, who is suing for millions of dollars because of a personal injury, and the plaintiff's attorney or whoever's involved in the litigation, can afford to pay this vocational expert for extensive labor market analysis based on that particular condition. If you're saying that the Seventh Circuit is requiring these vocational experts to become, and prepare statistical analysis on each one of these hypotheticals that we're giving, I'm saying that there's no way that these - we can conduct our hearings in such a way. If the Seventh Circuit wants to reverse every case I get, then they'll have to."

(Tr. 552)

Later, the ALJ concluded that the VE's testimony was sufficiently reliable:

11

> I see no reason to find [the VE's] testimony
> incredible. Whereas it may be the testimony
> that, if I had some more unusual
> hypotheticals, I might be able to find. So
> I'm going to accept her testimony. Now, I'm
> not going to order her to go through all of
> her labor market analysis and provide them,
> which might impact on these particular fig-
> ures, because that probably includes every-
> thing she's ever done. And probably, based on
> her experience, it might include all kinds of
> notes that she's got from stuff that she's
> done for placing people in jobs. And I don't
> think that's what the Seventh Circuit re-
> quires.

(Tr. 555)

The question facing this court is not whether the ALJ's inquiry was sufficiently similar to a Rule 702 inquiry to satisfy ***Donahue***. Rather, the question is whether the ALJ's actions can be considered willful disobedience of a court's order. The court does not agree that the ALJ intentionally defied the Seventh Circuit order. It is clear from the amount of time spent during McKinnie's hearing in the attempt to reach a common understanding of the scope of this inquiry that the ALJ attempted to conduct it in accordance with the Seventh Circuit opinion. Clearly McKinnie does not agree with the ALJ's conclusion, and based upon the agreement to remand this case, perhaps the Commissioner also finds the ALJ's conclusion lacking. However, McKinnie's assertion that the ALJ got it wrong is not equivalent to finding that the ALJ deliberately defied the order. There is no support for the conclusion that the ALJ purposefully ignored the court's order. The court concludes that McKinnie is not entitled to fees based

12

on the exceptions to the American rule incorporated into the EAJA through §2412(b).

The parties do not dispute that the government's position in this matter was not "substantially justified" under §2412(d) of the EAJA. The Commissioner also offered no dispute over the number of hours claimed by McKinnie's attorneys and their staff. The court agrees that the total hours, at 46.4, are reasonable. *See* 2412(d)(1)(C). The parties further agree that the statutorily capped hourly rates, adjusted for inflation, for the attorneys' time is $156.25 for 2005 and $160.00 for 2006. The only dispute remaining in this claim regards a $130.50 difference between the parties' view on the appropriate rate at which to compensate for paralegal/law clerk hours. McKinnie argues that these 2.9 hours should be compensated at $120.00 per hour. The Commissioner argues that it should be compensated at $75.00.

There is some disagreement among the circuits regarding whether paralegal hours are compensated under the EAJA as fees or only as an expense at cost. *Compare* **Krecioch v. U.S.,** 316 F.3d 684, 687 (7th Cir. 2003)("Fees for work done by paralegals can be awarded under the fee-shifting provision of the EAJA") *with* **Richlin Sec. Service Co. v. Chertoff**, 472 F.3d 1370, 1381 (Fed. Cir. 2006)(stating that the legislative history of the EAJA "strongly suggests that Congress did not intend to include paralegal expenses in the definition of 'attorney's fees,' but rather intended that paralegal fees be billed as expenses limited to the attorney's cost.). The prevailing view in this circuit compen-

13

sates paralegal hours as fees, however, typically not at the rate of $120.00 per hour. *See* **Mendez v. Barnhart**, No. 2-03-CV-309, Doc. 46 (N.D. Ind. Oct. 23, 2006). *See also* **Porter v. Barnhart**, No. 04 C 6009, 2006 WL 1722377 at *4 (N.D. Ill. 2006) (collecting cases describing paralegal fees awarded at rates from $50/hour to $85/hour). The hours described in this instance include time spent sending forms and documents, scanning documents, and e-mailing. These tasks do not warrant compensation at a paralegal rate. However, in this instance, the paralegal has significant experience and also spent time on more substantive tasks. Accordingly, the court finds that a more appropriate rate is $85.00 per hour.

Finally, McKinnie moved this court to amend his fee petition to include the filing fee of $250 that is due from the proceeds of any recovery he receives. The Commissioner offered no objection to this motion. Accordingly, this motion is **GRANTED**.

In sum, the court will award EAJA fees of $7,452.75. This figure includes 1 hour of attorney time in 2005 ($156.25/hour); 42.5 hours of attorney time in 2006 ($160/hour); 2.9 paralegal/-law clerk hours ($85/hour); and $250 representing the filing fee due on recovery.

_____

For the foregoing reasons, the Petition for Attorneys' Fees Under the Equal Access to Justice Act filed by the plaintiff, Festus M. McKinnie, on October 26, 2006 (DE 30), is **GRANTED IN PART** and **DENIED IN PART**, and the Motion to Amend His Petition for

14

Attorneys' Fees Under the Equal Access to Justice Act filed by the plaintiff on November 9, 2006 (DE 33), is **GRANTED**. The plaintiff is entitled to an award of fees and costs in the amount of $7,452.75.

    ENTERED this 5th day of March, 2007

                              s/ ANDREW P. RODOVICH
                                 United States Magistrate Judge